UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **CHRISTY METACARPA** and<br>**ROBERT METACARPA,**<br>individually and as Administrators of the<br>**ESTATE OF GARRETT B. METACARPA,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES OF AMERICA,**<br>**SOLDIER ON, INC., KEVIN CAHILL,** and<br>**JOHN F. DOWNING,**<br><br>Defendants. | CIVIL ACTION NO:<br><br><br>**COMPLAINT** |

## BRIEF INTRODUCTION

1.      Garrett B. Metacarpa ("Mr. Metacarpa") was a United States Army veteran, who

enlisted as a U.S. Soldier and served as a combat medic.  Having experienced first-hand the

brutality, death, and trauma of combat in the early years of Operation Iraqi Freedom, Mr.

Metacarpa was diagnosed with post-traumatic stress disorder ("PTSD").

2.      Mr. Metacarpa's PTSD was plagued by depression and suicidal ideation.  Mr.

Metacarpa first attempted to commit suicide in 2004 after his combat deployment, resulting in

his honorable discharge from the military.  Mr. Metacarpa's PTSD was "service-connected,"

entitling him to monthly disability payments from the Department of Veterans Affairs ("VA").

Mr. Metacarpa attempted to commit suicide on at least three subsequent  occasions in 2008,

2009, and 2015, all documented in his VA medical history.

3.      In 2016, Soldier On, Inc. ("Soldier On") and the VA failed to treat Mr. Metacarpa

leading to his tragic and avoidable suicide on the night of April 14-15, 2016.  In the wake of Mr.

Metacarpa's death, Soldier On's leadership lied to Mr. Metacarpa's family in an attempt to cover

up the culpability of Soldier On, Dr. Kevin Cahill, and the VA, further compounding the

emotional distress and suffering of Mr. Metacarpa's family.

4.     The Plaintiffs, the Estate of Garrett B. Metacarpa, and Mr. Metacarpa's parents,

Christy and Robert Metacarpa, individually and as Administrators of the Estate, bring this

Complaint for medical malpractice, wrongful death, conscious pain and suffering, punitive

damages, intentional and negligent infliction of emotional distress, and loss of consortium and

society against the Defendants for their malicious, willful, wanton, and reckless conduct,

negligence and gross negligence leading to the senseless and avoidable death of Mr. Metacarpa

on the night of April 14-15, 2016.

## JURISDICTION

5.     At all times material to this case, the VA was an agency of the United States of

America.  With respect to Defendant United States of America, jurisdiction is founded upon 28

U.S.C. § 1346, because the Complaint states causes of action under the Federal Tort Claim Act,

28  U.S.C. §2671, et seq., alleging that Mr. Metacarpa's injuries and death were caused by the

negligent, grossly negligent, and wrongful acts and omissions of certain employees of the VA

while acting within the scope of their office or employment, under circumstances where the

United States, if a private person, would be liable to the Plaintiffs in accordance with the laws of

the Commonwealth of Massachusetts.

6.     With respect to all other Defendants, diversity jurisdiction exists under 28

U.S.C. § 1332 as Mr. Metacarpa was a New York resident at the time of his death, and his estate

was created in New York.

7.     Plaintiffs Christy Metacarpa and Robert Metacarpa are Virginia residents.

8.     Defendants Dr. Kevin Cahill and John F. Downing are individuals who at all times relevant were Soldier On employees and Massachusetts residents.

9.     Defendant Soldier On is a corporation with a principal office in Massachusetts.

10.     The amount in controversy exceeds $75,000.

## VENUE

11.     Venue is proper in the District of Massachusetts under 28 U.S.C. §1391, because a substantial part of the events or omissions giving rise to Mr. Metacarpa's claims occurred in western Massachusetts within the District of Massachusetts.

## PARTIES

12.     Plaintiff, Christy Metacarpa, Mr. Metacarpa's mother, is an individual who resides at 103 West Links, Williamsburg, Virginia.

13.     Plaintiff, Robert Metacarpa, Mr. Metacarpa's father, is an individual who resides at 103 West Links, Williamsburg, Virginia.

14.     Plaintiffs Christy and Robert Metacarpa are the parents of Garrett B. Metacarpa, who died on the night of April 14, 2016 – April 15, 2016, as a result of the actions and omissions of the Defendants. *See* Ex. A (Death Certificate).

15.     The Estate of Garrett B. Metacarpa was created in New York and its duly appointed Administrators are Christy Metacarpa and Robert Metacarpa. *See* Ex. B (Letters of Administration).

16.     The United States of America is a Defendant in this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., arising from the acts and omissions of its employees and agents within the VA, an agency of the Defendant United States of America. The VA is an executive agency of the United States Government. The acts and omissions complained of

herein occurred at the VA Medical Center, located at 421 North Main Street, Leeds, Mass.,

("VAMC-Leeds"), which falls under the VA Central Western Massachusetts Healthcare System.

VAMC-Leeds is owned and operated by the Department of Veterans Affairs, an agency of the

United States of America.  In this case, the VA operated in a partnership and joint venture with

Soldier On.

17.     Defendant Soldier On is a Massachusetts corporation.  It was organized in

Massachusetts on July 18, 1994, and formerly operated under the name of United Veterans of

America, Inc.  Soldier On's principal office is located at 290 Merrill Road, Pittsfield, Mass.  It

operates a treatment and housing facility at VAMC-Leeds, where it has partnered with the VA.

18.     Defendant Dr. Kevin Cahill is an individual who resides in the Commonwealth of

Massachusetts.  Dr. Cahill works as Soldier On's staff psychologist and Director of Clinical

Services at VAMC-Leeds.

19.     Defendant John F. Downing was at all times relevant the President, CEO, and co-

founder of Soldier On.  Mr. Downing is an individual with a residence at 221 Barker Road,

Pittsfield, Mass.  At all times relevant, Mr. Downing supervised Soldier On's employees, and he

was responsible for oversight of its programs and partnership and joint venture with the VA.

20.     Soldier On and the VA held themselves out as "partners" and joint venturers.

Together they recruited Veterans to receive treatment at VAMC-Leeds.

## EXHAUSTION OF ADMINISTRATIVE PREREQUISITES

21.     All conditions precedent required of the Plaintiffs prior to bringing this action

have occurred or have been met, including all statutory pre-suit notice and investigation

requirements of the Federal Tort Claims Act, including 28 U.S.C. § 2401 and 28 U.S.C. 2675.

22.     On April 3, 2018, the Plaintiffs satisfied 28 U.S.C. 2675 by presenting these claims to the appropriate federal agency, the VA, by Federal Express overnight mail, on Standard Form 95 with attachments. *See* Ex. C (Plaintiffs' three (3) Standard Form 95 submissions sent to Department of Veterans Affairs, without enclosures).

23.     The Plaintiffs' three (3) Standard Form 95 submissions and incorporated by reference herein. *See* Ex. C. This correspondence provided the United States of America with timely and adequate notice of the claims, and provided the requisite demand for money damages in sum certain of $50,000,000. *See id.*

24.     Defendant, the United States of America through the VA, received the Plaintiffs' administrative tort claims along with the accompanying medical records.

25.     In response to the Plaintiffs' Standard Form 95 packages, on July 17, 2018, the VA wrote to the Plaintiffs and falsely claimed that it is not affiliated with Soldier On.

26.     By letter dated December 10, 2018, but received later, the VA denied the Plaintiffs' claims. *See* Ex. D (VA's denial letter). This Complaint has been filed within six (6) months of the VA's denial.

27.     On November 30, 2018, the Plaintiffs sent a medical malpractice presentment letter to Soldier On and Dr. Cahill, in compliance with M.G.L. c. 231, § 60L. Neither Soldier On nor Dr. Cahill has responded to the substance of the Plaintiffs' letter.

### AGENCY

28.     Defendant, the United States of America through the VA, is an agency of the United States Government and as such, sovereign immunity has been waived pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671to 2680.

29.     At all times material to this complaint, physicians, surgeons, specialists, administrators, nurses, social workers, coders, staff, interns, physician assistants, medical contractors, organizations that have partnered or entered into a joint venture with the VA, and medical personnel contracting with the VA and/or recruiting patients to come to the VA for treatment were employed by the VA to provide medical care and treatment to patients, including Mr. Metacarpa, in accordance with the accepted standard of care consistent with hospitals in the same or a similar medical community.

30.     At all times material to this complaint, the care providers were employed at the VA with a duty to provide medical care and treatment to the patient, Mr. Metacarpa, in accordance with the accepted standard of care consistent with hospitals in the same or a similar medical community.

31.     Soldier On operated in contractual privity with the VA and was located at VAMC-Leeds.  The VA allowed Soldier On to market and hold itself out as a "partner" and joint venturer with the VA, treat patients in conjunction with the VA on VA property, and recruit patients to come to VAMC-Leeds for medical treatment.

32.     Soldier On and the VA acted as partners and joint venturers to treat patients, such was the case with Mr. Metacarpa.  The acts and omissions of Soldier On may therefore be imputed to the VA.  The acts and omissions of the VA may be imputed to Soldier On.

## FACTS

33.     From April 25, 2002 through November 19, 2004, Mr. Metacarpa served in the United States Army as a combat medic, including a twelve (12) month deployment to Iraq in support of the initial stages of Operation Iraqi Freedom.

34.     After an attempted suicide, Mr. Metacarpa was separated from the Army under the Secretary's plenary authority IAW AR 635-200, ¶ 5-3, and received an honorable discharge.

35.     After leaving the Army, Mr. Metacarpa obtained degrees from the University of Albany in business and psychology, where he was also working on a Master's of Business Administration and teaching at the time of his death.  Mr. Metacarpa had employment history in numerous fields after his honorable discharge.

36.     As a combat medic in Iraq from 2003 through 2004, then Private First Class Metacarpa was repeatedly exposed to intense, graphic and traumatic violence, which resulted in a VA-assessed service connection for the disability of post-traumatic stress disorder ("PTSD"). Mr. Metacarpa qualified for medical care by the VA and possessed a VA identification card.

37.     From the time period shortly before his honorable discharge in 2004 until hours before his untimely and avoidable death on the night of April 14–15, 2016, Mr. Metacarpa sought treatment from various healthcare institutions, including but not limited to Dr. Kevin Cahill, Soldier On, Inc., Darnall Army Medical Center in Fort Hood, Texas, and various VA Medical Centers ("VAMC"), including in Austin, Texas; West Palm Beach, Florida; Albany and Bath, New York, and VAMC-Leeds.

38.     In 2004, Mr. Metacarpa was treated in Texas for mental health issues caused by his overseas combat exposure and a recent documented suicide attempt.  Mr. Metacarpa again attempted suicide in 2008 and 2009.  On May 28, 2009, Mr. Metacarpa was admitted to VAMC-Stratton in Albany, N.Y., for suicidal ideation and attempt, and was held as an inpatient for approximately three days.  In June of 2012, Mr. Metacarpa sought assistance from Soldier On. From this date forward Soldier On was aware of Mr. Metacarpa's struggles with PTSD, depression, and suicidality.

39.     In 2014, Mr. Metacarpa was admitted to VAMC-West Palm Beach for trouble

with substance abuse related to his mental health conditions.  Later that year Mr. Metacarpa was

admitted to VAMC-Stratton as an in-patient in its Substance Abuse Recovery and Rehabilitation

Treatment Program (SARRTP) in Albany, N.Y., again related to mental health conditions.

40.     On March 11, 2015 through July of 2015, Mr. Metacarpa was admitted to

VAMC-Bath for treatment in an in-patient program for alcoholism and post-traumatic stress

disorder.

41.     On May 12, 2015, Mr. Metacarpa (as an in-patient at VAMC-Bath) reached out to

Soldier On again to assist him with housing.

42.     Through May and July of 2015, Soldier On continued to be aware of Mr.

Metacarpa's struggles with PTSD, "persistent mental health and substance abuse problems,"

need for mental health provider, past substance abuse, and financial difficulties.

43.     On July 2, 2015, Mr. Metacarpa executed and delivered a release that provided

Soldier On access to Mr. Metacarpa's health records.  On November 15, 2015, Mr. Metacarpa

was once again admitted to VAMC-Stratton for in-patient care related to suicidal ideation.

44.     On or about February 8, 2016, Mr. Metacarpa was arrested for a misdemeanor

offense in Albany, N.Y., having been accused of criminal harassment for texting a female friend

who had canceled a date with Mr. Metacarpa.  The incident triggered Mr. Metacarpa's PTSD and

caused him to drink to excess, and it resulted in a violation of Mr. Metacarpa's probation for a

prior New York conviction of Driving While Intoxicated.  Mr. Metacarpa was incarcerated at the

Albany County Correctional Facility ("ACCF").  At that time, the VA's Veteran Justice

Outreach Coordinator was VA employee Courtney Slade, whose duties included visiting

Veterans such as Mr. Metacarpa and ensuring that their medical and other needs were addressed.

45.     On or about February 10, 2016, Plaintiffs Robert and Christy Metacarpa (Mr. Metacarpa's parents) telephoned VA employee Courtney Slade to express concern about Mr. Metacarpa's mental health and history of PTSD, depression, and suicidal ideation and suicidal attempts.  VA employee Courtney Slade did not visit Mr. Metacarpa until nine (9) days later.

46.     It was the practice of Soldier On and the VA to work closely with Veterans, like Mr. Metacarpa, incarcerated at ACCF.  On February 9, 2016, Soldier On conducted an entry assessment of Mr. Metacarpa, whom it designated as its new "client."  Mr. Metacarpa signed another release authorizing Soldier On to access Mr. Metacarpa's VA medical care documents for his treatment, care, and referrals, which, if reviewed, should have alerted Soldier On to Mr. Metacarpa's history with PTSD, depression and suicide.

47.     Mr. Metacarpa's legal issues arising out of his medical condition jeopardized his job, education benefits, living stipend, and liberty, all of which were or should have been red flags to Soldier On and the VA as they monitored Mr. Metacarpa.  At all times relevant to this case, Soldier On and the VA had the ability to speak with one another regarding Mr. Metacarpa's medical records, history, treatment and referral process, and treatment goals, but failed to do so.

48.     On February 11, 2016, Mr. Metacarpa was transferred to a bay of the ACCF known as the "Vet Pod," where Soldier On and the VA maintained special monitoring and access to Mr. Metacarpa and his records.  On February 12, 2016, Mr. Metacarpa celebrated his 37th birthday still incarcerated at ACCF.  The next week, on February 18, 2016, due to his incarceration, Mr. Metacarpa missed his scheduled VA Compensation and Pension Examination.  Mr. Metacarpa hoped for an overdue increase to his VA disability benefits at this hearing.

49.     At all times relevant, the VA and Soldier On failed to speak with one another regarding Mr. Metacarpa's medical records, history, treatment and referral process, and

treatment goals. Mr. Metacarpa also signed releases of his VA health and medical information authorizing the VA to speak openly to his parents, attorney, and the ACCF to better inform his treatment and continuity of care while incarcerated and afterward should he be released early.

50.     On February 18, 2016, VA employee Courtney Slade first visited Mr. Metacarpa, despite being telephoned by his parents on February 10, 2016. Mr. Metacarpa and VA employee Ms. Slade discussed Mr. Metacarpa's fears related to his psychiatric history and need for care. Mr. Metacarpa explained to VA employee Ms. Slade that he feared losing his standing as a student and teaching assistant, loss of income, loss of housing, cancellation of his VA compensation and pension appeal, and loss of GI Bill and other military service benefits.

51.     Mr. Metacarpa also expressed fears to the Defendants about his legal status, pending charges, interpersonal challenges, treatment needs, heightened stress, PTSD diagnosis, the destructive nature of his "all or nothing thought process," and drinking alcohol as a means of coping. Mr. Metacarpa described to VA employee Ms. Slade his openness to intervention and twice acknowledged his need for more intensive behavioral health treatment options, especially in regards to Mr. Metacarpa's coping skills and interpersonal development.

52.     VA employee Ms. Slade recorded that Mr. Metacarpa was suffering from anxiety and "psychiatric disorders," in addition to noting Mr. Metacarpa's diagnoses for, among others, "chronic post-traumatic stress disorder," attention deficit disorder with hyperactivity, lack of housing, and alcohol dependence.

53.     On February 22, 2016, Soldier On case notes document that Mr. Metacarpa disclosed similar information contained in his VA medical records, to include that Mr. Metacarpa suffered from "war related PTSD," "anxiety," stress, alcoholism, financial problems, and fears about lack of access to the military disability system.

54.     That day, as part of its partnership and joint venture with the VA, a Soldier On employee told Mr. Metacarpa that he was a good fit for a "tune-up" in the VA's Ward 8 program, a 6-week intensive in-patient program for veterans like Mr. Metacarpa ("VAMC-Leeds Ward 8 In-Patient Program"), designed for Veterans who suffer from PTSD and a history of suicidal attempts and ideation.  That same day, Mr. Metacarpa requested narcotics and alcoholism treatment from the ACCF, in the hope that he might be able to be transferred to the joint treatment program offered by Soldier On and the VA.

55.     Also on February 22, 2016, Mr. Metacarpa met with VA employee Courtney Slade, to whom Mr. Metacarpa expressed fears about his legal status, the cancellation of his veterans benefits appeal claim, and his struggles with PTSD.  VA employee Ms. Slade noted that Mr. Metacarpa presented with "depressed/angry mood, with restricted affect," displayed "impoverished" speech, was "not engaging in much discussion," and that his "presentation is below baseline by observation."

56.     On February 26, 2016, Mr. Metacarpa's mood further declined when he received a letter from his college and employer advising that his standing as a student and teaching assistant were in jeopardy.

57.     On February 29, 2016, Soldier On and the VA continued to meet with Mr. Metacarpa.  Mr. Metacarpa disclosed to Soldier On more about his fear of abandonment by his then attorney, the "incredible amount of pressure" at school, "a lot of questions about PTSD," "Combat related trauma," losing his spirituality, need for therapy, potential mania, and potential obsessiveness.  Once again, Soldier On told Mr. Metacarpa that he would be a good fit for the VAMC-Leeds Ward 8 In-Patient Program.

58.     Also on February 29, 2016, Mr. Metacarpa met with VA employee Courtney Slade, to whom Mr. Metacarpa again disclosed his fears, financial worries, fear of extended incarceration, losing out on veterans benefits, and vocational rehab.  Mr. Metacarpa also admitted to VA employee Ms. Slade that he was not participating in mental health services and no longer taking medication.  VA employee Ms. Slade did not intervene or consult with a physician or psychiatrist.  VA employee Ms. Slade noted that Mr. Metacarpa presented with "restricted affect, slightly agitated and frustrated based on situational factors."

59.     On March 1, 2016, Mr. Metacarpa again disclosed to Soldier On employee Joseph Kocot details from Mr. Metacarpa's VA medical records, including his PTSD disability.  In response, Soldier On employee Joseph Kocot "highly recommend[ed]" Soldier On's "Rehab Program," which was partnered with the VA in a joint venture located at VAMC-Leeds.

60.     Later on March 1, 2016, Soldier On employee Joseph Kocot telephoned Plaintiff Christy Metacarpa, and he shared his opinion that Mr. Metacarpa would benefit from further "treatment" by Soldier On and its partnership and joint venture with VAMC-Leeds.  Mr. Kocot also told Mrs. Metacarpa that he was planning to write a recommendation to the presiding judge that Mr. Metacarpa be placed in a Veteran "rehab program" at VAMC-Leeds in lieu of continued confinement.

61.     Soldier On employee Joseph Kocot met with Mr. Metacarpa again on March 4 and March 11 of 2016 to discuss the treatment planned for Mr. Metacarpa at Soldier On's program at VAMC-Leeds.

62.     On March 4, 2016, Defendant Dr. Kevin Cahill, a psychologist employed by Soldier On, called Plaintiff Christy Metacarpa and referred to himself as "Dr. Cahill."  Dr. Cahill attempted to "sell" Soldier On's treatment capabilities to Mrs. Metacarpa, telling her that Soldier

On's program at VAMC-Leeds was the right place to treat her son Mr. Metacarpa's "past and present problems" and fears about his future.

63.     By this time, Mr. Metacarpa was well known to Soldier On and Soldier On was privy to the care provided by the VA.

64.     Consistent with advertising on Soldier On's website, Soldier On held itself out to the Metacarpas as a partner and joint venturer with the VA, which would honor Mr. Metacarpa's "continuum of care", offer a "wide variety of treatment groups" and a "full time psychologist who focuses on the chronically mentally ill and veterans with dual diagnosis", and veteran "health care."

65.     On March 7, 2016, around 1:17pm, VA employee Courtney Slade met with Mr. Metacarpa. Mr. Metacarpa disclosed to VA employee Ms. Slade that he "had plans to meet with Soldier On psychologist, in the jail, today in the hopes of getting documentation supporting his enrollment in the program in leiu [sic] of incarceration." Thus, the VA was well aware of Mr. Metacarpa's desire and plan to transfer to and receive treatment at its VAMC-Leeds location.

66.     On March 7, 2016, Mr. Metacarpa told Soldier On more about his combat exposure from the military, PTSD disability, and losing his girlfriend while he was deployed to Iraq. Mr. Metacarpa also disclosed that he was struggling with the pressure to live up to expectations, failing his prior treatment plan at VAMC-Bath, his inability to internalize, losing his VA benefits, and a feeling of continuous loss and despair.

67.     Mr. Metacarpa also disclosed to Soldier On and the VA other obvious red flags, including that he was suffering from nightmares. For instance, Mr. Metacarpa told Soldier On: "All I feel is disappointment."

68.     On March 7, 2016[1], Dr. Cahill wrote a letter to the presiding judge in Mr. Metacarpa's Albany case, referring to himself as "a licensed psychotherapist in the Commonwealth of Massachusetts" and the Vice President responsible for "treatment" at Soldier On.  In his letter, Dr. Cahill cited Mr. Metacarpa's "war related PTSD," substance dependency disorder, other trauma, anxiety, lack of functionality, and drug use.  Dr. Cahill recommended a "structured environment[]" including "substance recovery programs, clinical assessment and treatment planning, case management, [] nutrition/resiliency," VA services, and possible further treatment in the PTSD program at the VA.

69.     With respect to Dr. Cahill's purported licensure allowing him to "treat" or "counsel" patients in Massachusetts or New York, or to recommend treatment programs at the VA, Dr. Cahill signed his letter to the court incorrectly dated "2-7-16" as "Kevin Cahill, Ph.D., LMHC".  According to his LinkedIn page, he obtained a Ph.D. in "History: Mental Health" in three years from 1977-1980 in Dublin, Ireland.  He obtained the degree of "Master of Education: Counseling Psychology" in Massachusetts much later, 2007-2009, and was licensed in Massachusetts as a mental health counselor.  He also represents himself as the Vice President for Treatment at Soldier On.

70.     Soldier On holds itself out as a treatment program for substance abuse disorder, PTSD and other conditions and claims to be affiliated with the VA as its "partner" and joint venturer.

71.     Dr. Cahill's letter of March 7, 2016 demonstrates his familiarity with Mr. Metacarpa's psychiatric and substance problems and recommends a panoply of services allegedly available from Soldier On and VAMC-Leeds sufficient to care for Mr. Metacarpa.  The

---

[1]     The letter is mistakenly dated February 7, 2016, but it was in fact submitted by Dr. Cahill on March 7, 2016.

letter provides that Dr. Cahill has met with Mr. Metacarpa four times, however, despite valid requests for Mr. Metacarpa's records, Soldier On has never provided the Plaintiffs with Dr. Cahill's notes, assessment, or records from these four alleged visits.  Finally, the letter reaffirms Soldier On's partnership and joint venture with the VA by mentioning that if Mr. Metacarpa were transferred to Soldier On's VAMC-Leeds location, "he would also be able to take advantage of the VA services which are available including possible further treatment in the PTSD program there."

72.     During a lengthy telephone call on March 7, 2016, Dr. Cahill explained to Plaintiff Christy Metacarpa that he sent a letter to the Albany court recommending Soldier On's VAMC-Leeds facility as an avenue for continued treatment for Mr. Metacarpa.

73.     Dr. Cahill promised Plaintiff Christy Metacarpa that if Mr. Metacarpa were sent to Soldier On, then Dr. Cahill would personally "see Garrett one-on-one two to three times per week."

74.     On March 8, 2016, Soldier On employee Joseph Kocot wrote to the Albany Court overseeing Mr. Metacarpa's case and stated that Mr. Metacarpa had been working with Soldier On since February 15, 2016, Mr. Metacarpa had been "accepted" by Soldier On's screening for its programs, and that if Mr. Metacarpa was sent to Soldier On he would have "many services available to him, including, AA/NA, peer support, life skills, gratitude groups, anger management, employment assistance and many more."

75.     On March 10, 2016, Soldier On's Director of Case Management, John H. Crane III, wrote a letter of eligibility for Mr. Metacarpa to enter Soldier On's program at VAMC-Leeds.  Soldier On's letter promised to the Metacarpa family, the VA, Albany Court, and all

concerned that Soldier On provided "a daily program of substance abuse, mental health, case management, vocational rehab and housing services" to Veterans such as Mr. Metacarpa.

76.     Soldier On met with Mr. Metacarpa again on March 11, 2016. Mr. Metacarpa expressed hope that he might be able to transfer to Soldier On and receive the treatment that it and Dr. Cahill promised through Soldier On and the VAMC-Leeds Ward 8 In-Patient Program.

77.     On March 11, 2016, Mr. Metacarpa also wrote to the Albany presiding judge, stating: "I have lost [everything]," this is "a death sentence," "I suffer the pain of dying several times a day," and citing his struggles with PTSD, long hours, "high levels of stress," "nightmares involving battles in Iraq." Mr. Metacarpa acknowledged his need for and requests a "program" and a "treatment situation," as was promised by Dr. Cahill, Soldier On and the VA.

78.     On March 16, 2016, Plaintiff Christy Metacarpa telephoned the VA at Albany and asked about treatment programs for her son Mr. Metacarpa, once again reminding the VA of Mr. Metacarpa's history of PTSD and suicidal ideation and attempts.

79.     On March 21, 2016, Mr. Metacarpa pleaded with VA employee Courtney Slade in the hopes of being sent to a treatment program, such as Soldier On's facility at the VAMC-Leeds campus. Mr. Metacarpa asked VA employee Courtney Slade questions about Soldier On and his ongoing probation, but Ms. Slade could not answer them. VA employee Ms. Slade's notes state that she told Mr. Metacarpa that she would assist with "coordination of care," but the records indicate that neither Ms. Slade nor her employer, the VA, ever took any steps to inquire into Mr. Metacarpa's questions or otherwise contact Soldier On or VAMC-Leeds to arrange for Mr. Metacarpa's continuity or coordination of care, as promised.

80.     Similarly, despite stressing its "partnership" and joint venture with the VA, Soldier On took no steps to communicate with the VA to coordinate Mr. Metacarpa's transition and continuity of care.

81.     On March 23, 2016, due to his incarceration, Mr. Metacarpa missed a Social Security hearing at which he hoped to receive benefits. On April 1 and 4, 2016, Mr. Metacarpa received distressing correspondence from his college about additional disciplinary actions being taken and going forward against him.

82.     On April 7, 2016, upon Soldier On's and the VA's promises of mental health treatment, the Albany Court approved Mr. Metacarpa's early release from incarceration and transfer to Soldier On at the VA so that Mr. Metacarpa could receive "treatment" there.

83.     On April 8, 2016, a Soldier On employee wrote in Mr. Metacarpa's file that Mr. Metacarpa "would benefit from one on one counseling through the VA, especially during the transition from Albany County House of correction [sic]." However, no one affiliated with Soldier On or its partner and joint venturer, the VA, took any steps to coordinate "one on one" counseling in advance of Mr. Metacarpa's pending transfer to Soldier On at VAMC-Leeds. On April 8, 2016, upon Mr. Metacarpa's release, neither Soldier On nor the VA coordinated any steps to move Mr. Metacarpa to his new residence at VAMC-Leeds, and no records or information were shared among the agencies. The documents do not reveal any continuity of care was discussed or implemented between Soldier On and the VA.

84.     Instead, a college-aged person with no medical training was tasked with driving Mr. Metacarpa from Albany, N.Y., to Soldier On at the VAMC-Leeds., when Mr. Metacarpa was clearly at risk of transfer trauma. During this time, Mr. Metacarpa called his mother (Plaintiff Christy Metacarpa) and explained to her that he was panicking about the lack of preparation and

organization involved with his transfer.  During a phone call with his mother, Mr. Metacarpa stated that he was dropped off at the wrong building and was very worried about his personal health and safety.

85.    Plaintiff Christy Metacarpa had telephoned Soldier On prior to her son's transfer to report about the lack of preparation and continuity of care that she and Mr. Metacarpa observed.  She further reminded Soldier On of Mr. Metacarpa's history of suicide, depression, and mental health problems.  John Crane, Soldier On's Director of Case Management, told Christy Metacarpa that he would handle the issues.  However, he did nothing meaningful to plan for Mr. Metacarpa's continuity of care in advance of or during the transfer.

86.    For example, when Mr. Metacarpa was dropped off at Soldier On's location at VAMC-Leeds, no one was there to greet him, assist him with his transition, enroll him in treatment, or enroll him in VAMC-Leeds Ward 8 In-Patient Program that was promised to him and the Albany Court.  There was no structure in place for a medical professional to assist Mr. Metacarpa upon arrival.  Mr. Metacarpa had an extremely stressful transition to Soldier On and complained about the "heat," repeatedly saying he felt like he was having flashbacks as if he was "back in Iraq."

87.    Soldier On conducted another assessment of its "client", Mr. Metacarpa, rendering a "Continuum of Care Code" of "MA-507" and noting Mr. Metacarpa's "Disabling Condition."  However, despite having full access to Mr. Metacarpa's VA medical history and having worked with Mr. Metacarpa since early February 2016 up until his April 8 transfer, Soldier On failed to establish a plan to transition Mr. Metacarpa into the VAMC-Leeds Ward 8 In-Patient Program or even have him seen by a medical provider.  Instead, Soldier On placed Mr. Metacarpa in "Building 6," an unsupervised and unstructured transitional housing building with

sign-in, pass and bed-check policies that went completely ignored by residents and unenforced by Soldier On.

88.     The VA and Soldier On had plenty of lead time and should have admitted Mr. Metacarpa to a structured, supervised in-patient program, such as the VAMC-Leeds Ward 8 In-Patient Program.  No record of a substantial contemporaneous assessment of Mr. Metacarpa's needs, review of his prior records or coordination with providers at the VA took place from the time of Mr. Metacarpa's arrival at Soldier On's VAMC-Leeds facility to the time of his death on April 14-15, 2016.  It is not clear how it was determined that Mr. Metacarpa's assignment to unsupervised, unstructured, transitional housing at Building 6 at Soldier On would be adequate to meet his complex needs.  While a number of serious conditions contributing to suicide risk were known or should have been known to Dr. Cahill and the staff of Soldier On, these red flags received no attention.  Instead, Mr. Metacarpa was placed in an unsupervised setting where he quickly relapsed and died within one week.

89.     As a resident of Building 6, Mr. Metacarpa was exposed to rampant drug abuse, lawlessness, and lack of mental health counseling at Soldier On's VAMC-Leeds location.  Based on the conditions at Soldier On's VAMC-Leeds program, Mr. Metacarpa confided to his mother that he wished he was back in jail.

90.     Mr. Metacarpa was assigned a "Case Manager," Matthew Stenson, with no medical credentials of any kind, despite the fact that Soldier On and the VA had monitored and met with Mr. Metacarpa since February and knew of his need for mental health treatment.  Mr. Stenson assigned Mr. Metacarpa to a "Service Plan" consisting of "Substance Abuse" and "paperwork," but no mental health treatment.

91.     The Defendants failed to assign Mr. Metacarpa a primary care physician.

92.     During Mr. Metacarpa's stay at Soldier On, Dr. Cahill never once met with Mr.
Metacarpa despite promising Plaintiff Christy Metacarpa that he would do so one-on-one "two to
three times per week."   Nor did Soldier On refer Mr. Metacarpa to the VA for any separate
evaluation or treatment at this time.

93.     For example, the VA's appointed case manager, VA employee Courtney Slade,
was not even aware that Mr. Metacarpa was at Soldier On until April 11, 2016.  Once Soldier On
had received credit for Mr. Metacarpa being moved to its VA location, Soldier On, Dr. Cahill
and the VA left Mr. Metacarpa to fend for himself despite his known suicidal tendencies and
risks.

94.     On April 8, 2016, it was revealed to Soldier On that Mr. Metacarpa relapsed when
he tested positive for benzodiazepines.  Drug abuse significantly raised the risks associated with
placing Mr. Metacarpa in an unsupervised housing unit.  It was also significant in light of Mr.
Metacarpa's extensive history of suicide, depression, and PTSD, and the Defendants' failure to
treat Mr. Metacarpa despite the fact that he was in relapse.

95.     Nonetheless, Soldier On took no steps to safeguard Mr. Metacarpa or admit him
to in-patient care which was available on-site at the VA, require Mr. Metacarpa to meet with a
medical provider, or ensure that he was following Soldier On's sign-in and pass policies.  The
VA failed to supervise and coordinate with its partner and joint venturer, Soldier On.

96.     In addition to failing to provide promised mental health care, there was no
sufficient structure at Soldier On's VAMC-Leeds facility.  Despite promising a structured
environment to Plaintiff Christy Metacarpa and the Court, Soldier On and the VA allowed Mr.
Metacarpa to leave the VA campus freely, as evidenced by ATM withdrawals on April 8 ($200
from an ATM at 58 Main Street, Northampton, Mass.) and April 9 (over $1,600 at ATMs at

King Street, Northampton, and debits at Walmart locations in Northampton and Westfield, Mass.).

97.     Written sign-in and bed check policies went wholly unenforced. Mr. Metacarpa was assigned to live with residents who were drinking alcohol and using drugs openly and unregulated, a dangerous circumstance considering Mr. Metacarpa's past struggles.

98.     Mr. Metacarpa left the premises for the weekend of April 9-10, 2016, stayed at the Hotel Northampton, and withdrew large sums of money from various ATMs. Mr. Metacarpa complained to his mother that no one at the VA or Soldier On was helping him, and that "drug addicts run the place" at Soldier On. Despite a complete and thorough knowledge of Mr. Metacarpa's history, neither the VA nor Soldier On intervened while Mr. Metacarpa was away over the weekend without permission.

### April 10, 2016: Four Days before Mr. Metacarpa's death

99.     On April 10, 2016, Mr. Metacarpa disclosed to Soldier On employee Geoff Raiti that he was struggling with losing housing in Albany, and that he intended to place all of his possessions into storage. Like other Soldier On employees before him (Dr. Cahill, Mr. Kocot and Mr. Stenson), Mr. Raiti either lacked the training to recognize these red flags in a high-risk resident such as Mr. Metacarpa, or he outright ignored them.

100.    Mr. Metacarpa also reached out to Mr. Stenson that day, confiding in him about legal troubles and the reason for Mr. Metacarpa's arrival at Soldier On and the VA. Mr. Metacarpa disclosed to Mr. Stenson that Mr. Metacarpa was suffering from "service connected PTSD." Mr. Stenson found these statements important enough to recorded in Mr. Metacarpa's treatment record, writing that Mr. Metacarpa was suffering from "significant hindrances related to this diagnosis that interfere with his ADLS, including nightmares, flashbacks and cold sweats," and that Mr. Metacarpa had been treated in the VA for these issues in the past. Despite

witnessing and journaling about Mr. Metacarpa's obvious downfall, Soldier On again took no

steps to intervene.  That night, Mr. Metacarpa was listed as "TC" at all three bed checks.

### *April 11, 2016: Three Days before Mr. Metacarpa's death*

101.    On April 11, 2016, Mr. Stenson, of Soldier On, acknowledged in Mr. Metacarpa's

treatment record:

> "It is going to be crucially important to get the veteran [Mr. Metacarpa] reengaged
> in long term treatment during his stay at Soldier On, including individual and
> group therapies as well as substance abuse treatment."

102.    Despite entries of this nature, neither Dr. Cahill nor the VA was alerted.  Utterly

unsupervised, Mr. Metacarpa continued coming and going freely from Soldier On and VAMC-

Leeds.

103.    Mr. Metacarpa also disclosed to Mr. Stenson details about Mr. Metacarpa's

combat service in Iraq wherein Mr. Metacarpa saw significant injuries and death.  Mr. Stenson

acknowledged:

> "Veteran [Mr. Metacarpa] has a diagnosis of PTSD associated with operation
> Iraqi freedom, which is rated at 30%.  Veteran was a combat medic in the Army,
> and reports to have seen some significant injuries/deaths associated with this duty.
> Veteran reports he has taken part in many treatment programs offered through the
> VA surrounding this diagnosis.  Veteran still needs to partake in long term
> substance abuse treatment programming.  The veteran has been instructed to
> partake in the phase program offered at Soldier On.  The veteran is also a good
> candidate for the SUDS program offered through the VA.  The veteran will also
> benefit from one on one counseling through the VA, especially during the
> transition from Albany County House of correction [sic]."

104.    That same day on April 11, 2016, back in Albany, VA employee Courtney Slade

tried to check in on Mr. Metacarpa at ACCF, because the VA had lost track of Mr. Metacarpa

and was completely unaware that he had moved to Soldier On at VAMC-Leeds.  As of April 11,

2016, neither Soldier On nor the VA had made any efforts to communicate with one another in

furtherance of Mr. Metacarpa's continuity of care despite his transfer from the Veterans' Bay to

Soldier On at VAMC-Leeds on April 8, 2016.

105.    Mr. Metacarpa called his mother at approximately 11:15pm on the night of April

11, 2016. Mr. Metacarpa was very agitated and again complained about his living conditions as

"horrible" and no one at Soldier On or the VA was helping him with his ongoing PTSD battle.

Mr. Metacarpa told his mother he would rather be in jail than at Soldier On.  Plaintiff Christy

Metacarpa told Mr. Metacarpa to go to the hospital and seek help, which Mr. Metacarpa agreed

to do the next morning.

106.    That night, Mr. Metacarpa was listed as "TC" at all three bed checks.

### *April 12, 2016:  Two Days before Mr. Metacarpa's death*

107.    On the morning of April 12, 2016, Mr. Metacarpa told Mr. Stenson that he was

suicidal. Soldier On sent Mr. Metacarpa to the VAMC-Leeds mental health clinic based on his

"suicidal" thoughts, instead of escorting or even referring him to the emergency room.  There is

no indication that Dr. Cahill was alerted or, if he was, that he intervened.  Indeed, neither the VA

nor Soldier On provided Mr. Metacarpa with a doctor.  Instead, the VA assigned Mr. Metacarpa

to a VA social worker, Mr. Steve Flynn.

108.    VA social worker Steve Flynn conducted a Uniform Outpatient Mental Health

Assessment of Mr. Metacarpa, during which Mr. Metacarpa disclosed numerous red flags,

including:

    a.  Mr. Metacarpa was struggling to cope with alcoholism;

    b.  Mr. Metacarpa recently suffered a PTSD attack that resulted in his incarceration
       in Albany;

    c.  Mr. Metacarpa needed treatment for PTSD;

    d.  Mr. Metacarpa was fearful about his past and current mental health symptoms;

e. Mr. Metacarpa needed help with his current PTSD symptoms, to include impulsive behavior, hypervigilance, irritability, nightmares, night sweats, stress, and sensitivity to heat;

f. Mr. Metacarpa suffered from a long history of suicidality, including treatment at the Albany VA in November 2015 for attempted suicide, and also for attempted suicide in 2004, 2008, and 2009;

g. Mr. Metacarpa was concerned about his current substance abuse and binge drinking;

h. Mr. Metacarpa suffered from black-outs;

i. Mr. Metacarpa's substance abuse was "highly correlated to the amount of stress in his life";

j. Mr. Metacarpa was uncomfortable living at VAMC-Leeds;

k. Mr. Metacarpa had no supports at VAMC-Leeds;

l. Mr. Metacarpa was "subdued" and described his own mood and affect as "numb";

m. Mr. Metacarpa was suffering from insomnia;

n. Mr. Metacarpa said that he would have rather been back in jail than at VAMC-Leeds;

o. Mr. Metacarpa was open to and requesting treatment at VAMC-Leeds Ward 8 In-Patient Program;

p. Mr. Metacarpa's condition made him unable to work;

109. When asked how the VA could help meet his goals, Mr. Metacarpa answered that he needed "assistance with PTSD treatment"; and

110. When asked what he would like to see happen next, Mr. Metacarpa answered: "Referral to PTSD treatment."

111. Based on the releases signed by Mr. Metacarpa, Soldier On had access to these notations, as well as all other VA encounters and records. The VA was obliged to provide them to Soldier On, but did not do so.

112.    The Uniform Outpatient Mental Health Assessment included an alcohol screen.

Mr. Metacarpa tested "positive" in the alcohol screen with a score of "5". Mr. Metacarpa met

the criteria for in-patient admission for substance abuse treatment. However, VA social worker

Steve Flynn did not admit or recommend admitting Mr. Metacarpa, or consult with a psychiatrist

or psychologist with the VA or Soldier On. Instead, VA social worker Steve Flynn merely told

Mr. Metacarpa to abstain from alcohol, despite the known risks of alcohol use by a person

suffering from psychiatric disorders, depression and suicidal ideation and attempts.

113.    The Uniform Outpatient Mental Health Assessment also included a depression

screen. Mr. Metacarpa tested "positive" for depression and was assessed as "suggestive for mild

depression," receiving a score of "8." VA social worker Steve Flynn conducted this portion of

the assessment himself even though the VA required the assessment to be conducted by a

"Provider."

114.    The requirement for Provider oversight is relevant because VAMC-Leeds had a

poor history with patient suicides. For example, on June 5, 2004, United States Marine Corps

Veteran Jeff Lucey sought admission to the same VAMC-Leeds mental health facility while in

crisis. The VA denied admission to Veteran Lucey without consulting a psychiatrist. Later that

month, Veteran Lucey tragically committed suicide. In the wake of Veteran Lucey's death,

VAMC-Leeds ordered that a psychiatrist must always be consulted on mental health cases.

However, this life-saving measure was ignored in Mr. Metacarpa's case.

115.    During his depression screening, Mr. Metacarpa revealed the following red flags:

    a.  Mr. Metacarpa displayed "little interest or pleasure in doing things" on "several
        days";

    b.  Mr. Metacarpa felt "down, depressed, or hopeless" on "several days";

c. Mr. Metacarpa had trouble falling asleep, staying asleep, or sleeping too much on "several days";

d. Mr. Metacarpa had "poor appetite or overeating" on "several days";

e. Mr. Metacarpa felt bad about himself or that he was a failure or that he had let himself and his family down "more than half the days"; and

f. Mr. Metacarpa had trouble concentrating on things "more than half the days".

116. Despite these results, VA social worker Steve Flynn did not admit or recommend admission of Mr. Metacarpa, and never consulted a psychiatrist, despite the change in policy after Veteran Lucey's suicide at VAMC-Leeds in 2004.

117. VA social worker Steve Flynn also conducted a Mental Health Suicide and Homicide Risk Assessment for Mr. Metacarpa without consulting a psychiatrist. Among other risks of suicide, the Mental Health Suicide and Homicide Risk Assessment of Mr. Metacarpa revealed that:

a. Mr. Metacarpa had attempted suicide multiple times in the past;

b. Mr. Metacarpa displayed a current risk of harm to self;

c. In the past six months, Mr. Metacarpa was bothered by feeling down, depressed, or hopeless;

d. Mr. Metacarpa said "yes" to suicidal ideation;

e. Mr. Metacarpa had a history of previous suicidal attempts and gestures;

f. Mr. Metacarpa maintained a sense of "hopelessness";

g. Mr. Metacarpa suffered a recent loss and absence of social support;

h. Mr. Metacarpa suffered a recent loss and absence of relationships;

i. Mr. Metacarpa suffered a recent loss and absence of his graduate school contract;

j. Mr. Metacarpa suffered a recent loss and absence of his job;

k. Mr. Metacarpa suffered a recent loss and absence of financial support;

l. Mr. Metacarpa had a history of impulsivity;

m.  Mr. Metacarpa had a history of psychiatric diagnosis including PTSD;

n.  The strength rating for Mr. Metacarpa's "protective factors" was rated as "low"; and

o.  Mr. Metacarpa had no current therapeutic alliance with a mental health professional.

118.   Once again, this assessment was required to be completed by a "provider," but only Mr. Flynn, a VA social worker, assessed Mr. Metacarpa on April 12, 2016.

119.   The Uniform Outpatient Mental Health Assessment also included a "Suicide Risk Evaluation," which again, according to the VA's own written policies, is to be "Done by PROVIDER ONLY!" Nonetheless, VA social worker Steve Flynn conducted this portion of the assessment himself without consulting a psychiatrist or medical doctor.  During the Suicide Risk Evaluation, Mr. Metacarpa revealed, among other things, the following red flags:

a.  Mr. Metacarpa was feeling hopeless about the present and future; and

b.  Mr. Metacarpa had previously attempted suicide in 2008 and 2009.

120.   According to VA social worker Steve Flynn, Mr. Metacarpa displayed "some suicidal ideation, but it is my [VA social worker Steve Flynn's] opinion that the patient is safe to return home **with close follow-up**." (Emphasis supplied).  Neither the VA nor Soldier On conducted any follow-up.

121.   The VA and Soldier On ignored these results or altogether failed to implement an alert system with the VA by which Dr. Cahill or some qualified person would be notified about the suicidality of Soldier On's residents.  Despite boasting about their "partnership" and joint venture with the VA, Soldier On and the VA took no steps to ensure continuity of care with respect to suicidal Veterans such as Mr. Metacarpa.

122.   In addition to the above assessment, Mr. Metacarpa's VA and Soldier On records were full of indicators of PTSD, suicidal ideation, and stressors that were available to the VA

and Soldier On, but were never addressed by the VA or Soldier On.  The VA and Soldier On failed to implement any continuity of care mechanisms for communicating concerns about Mr. Metacarpa.

123.    While at the VA campus and as a resident of Soldier On, Mr. Metacarpa exhibited risk factors including (1) intermittent suicidal thoughts, (2) prior suicide attempts, (3) prior psychiatric hospitalizations, (4) substance use disorder, (5) PTSD, (6) anxiety and depression, (7) impulsivity, (8) romantic and other acute losses or narcissistic injuries and (9) access to lethal means.  All of these were demonstrably present but were either inadequately assessed or their significance was not appreciated by Soldier on or the VA.  Others may have been present.

124.    On April 12, 2016, Soldier On administered a Substance Abuse Disorder Assessment five days after Mr. Metacarpa arrived.  The assessment confirmed that Mr. Metacarpa had used drugs and alcohol.  The assessment also indicated that Mr. Metacarpa was suffering from various conditions, such as PTSD, depression, anxiety, drug and alcohol issues, and others.

125.    Despite these results, the VA and Soldier On made no further inquiry into the subject, and took no preventative measures with respect to Mr. Metacarpa's lack of structure, medical treatment or one-on-one counseling.  These records were not shared with the VA, and the VA did not share its assessment with Soldier On, despite the existence of a valid release executed by Mr. Metacarpa, and the fact that Soldier On held itself out to the Plaintiffs and the public as a "work[ing] in partnership with the Department of Veterans Affairs...."

126.    During the April 12, 2016 assessments, triggered by Mr. Metacarpa sharing "suicidal" thoughts to a Soldier On employee, Matthew Stenson, Mr. Metacarpa was so depressed that he said he would rather be back in jail than at Soldier On, and that he wanted to

enter the VAMC-Leeds Ward 8 In-Patient Program, as he had discussed with the VA and Soldier On previously.

127. Despite the above red flags, the VA and Soldier On failed to adequately treat Mr. Metacarpa, inappropriately took no steps to safeguard Mr. Metacarpa from himself or admit him to VAMC-Leeds Ward 8 In-Patient Program, and once again failed to flag or otherwise alert medical doctors about Mr. Metacarpa's circumstances and mental health risks.

### April 13, 2016: One Day before Mr. Metacarpa's death

128. On April 13, 2016, Mr. Metacarpa continued to come and go unsupervised and unmonitored from the VAMC-Leeds campus as he pleased, blatantly violating Soldier On's written but unenforced alcohol, pass, curfew and sign-in policies. Mr. Metacarpa withdrew large sums of cash, which provided him access to alcohol and illicit drugs. He displayed erratic behavior that went unaddressed by the VA or Soldier On.

### April 14, 2016: Hours before Mr. Metacarpa's death

129. On April 14, 2016, Mr. Metacarpa awoke at Soldier On around 3:00am, unable to fall back to sleep. After approximately 11:00 am, Mr. Metacarpa was seen on the telephone arguing with someone about finances, but no one intervened to see what was wrong. At approximately 1:00 pm, Mr. Metacarpa failed to report for a "mandatory" Soldier On group therapy session. Despite failing to report, Soldier On did not do anything to check in on Mr. Metacarpa's whereabouts and safety.

130. At approximately 1:45 pm, unable to obtain one-on-one counseling from Soldier On or Dr. Cahill, Mr. Metacarpa presented at the VAMC-Leeds mental health clinic on his own and asked to be admitted to the VAMC-Leeds Ward 8 In-Patient Program. This was the program that Soldier On and the VA had convinced the Albany Court and Plaintiff Christy Metacarpa

would help Mr. Metacarpa for a "tune up", and which Mr. Metacarpa expected to be enrolled in upon arrival at VAMC-Leeds.

131.    When Mr. Metacarpa arrived at the VA mental health clinic to enter the Ward 8 In-Patient Program, VA employee and social worker Steve Flynn was working the desk, the same person who conducted Mr. Metacarpa's assessments two days earlier. VA social worker Steve Flynn knew of Mr. Metacarpa's suicidal tendencies, statements and past. Nonetheless, VA employee Steve Flynn denied Mr. Metacarpa entry to the in-patient program, because Mr. Flynn "could not locate the paper form" to complete the admission application process.

132.    Instead of consulting with a medical doctor, finding the form, or admitting Mr. Metacarpa without the form, VA employee Flynn asked Mr. Metacarpa, a psychiatric patient diagnosed with PTSD and a history of suicide attempts and recent ideation, to leave and come back the next day.

133.    VA social worker Steve Flynn ignored Mr. Metacarpa's records and history of suicidal ideation and attempts. Mr. Flynn ignored Mr. Metacarpa's suicidal ideation two days earlier on April 12, 2016. The VA failed to implement a mechanism to flag Mr. Metacarpa's lengthy history of mental health problems, recent suicidal ideation, and pressing risks of suicide, to include Mr. Metacarpa's recent incarceration, loss of job, loss of student status, loss of housing, transfer to a place with no familiarity or support, nightmares, feelings of hopelessness, lost VA benefits, legal troubles, alcohol and narcotics usage, and intense pressure, stress, depression, and anxiety.

134.    The VA, Dr. Cahill and Soldier On failed to implement a reporting system whereby Mr. Metacarpa would be immediately referred to Dr. Cahill. Instead, Mr. Metacarpa was sent away on his own.

135.    After being turned away by the VA, Mr. Metacarpa was next seen in his room by his roommates and in the presence of Soldier On staff.  Mr. Metacarpa was stripping the sheets off of his bed.  Despite written policies for bed checks, Soldier On and the VA ignored the fact that Mr. Metacarpa was again missing and that his sheets had been removed.  Just hours later, during the night of April 14 – 15, 2016, Mr. Metacarpa would use those same sheets to fashion a ligature and commit suicide by hanging.

136.    In the few hours remaining until his suicide later than night, Mr. Metacarpa made phone calls, withdrew the remaining amount of cash from his account, came and went from the VA campus without signing in or out, and purchased hard alcohol which he consumed.  Despite promising to the Albany Court that it would provide a structured environment and mental health treatment, no one at Soldier On or the VA stopped Mr. Metacarpa or asked him how he was doing.  Soldier On and the VA took no steps to locate Mr. Metacarpa when he was listed as absent during that night's bed checks.

137.    Mr. Metacarpa called his mother (Plaintiff Christy Metacarpa) around 8:07 pm and told her that he was finally being moved, and that he was organizing his things.  He told her that he would call her back in two hours.  However, that was the last time that Plaintiff Christy Metacarpa ever heard her son's voice.

### *The night of April 14-15, 2016: Mr. Metacarpa takes his life*

138.    During the early morning of April 15, 2016, two pedestrians discovered Mr. Metacarpa's body hanging from a tree about 50 yards into the woods off of a bike path near the Soldier On campus at VAMC-Leeds.  Mr. Metacarpa's body was hanging by the bed sheets he removed in the presence of Soldier On staff just after he was denied admission by the VA.  In the

end, Dr. Cahill never met with Mr. Metacarpa once at the VAMC-Leeds location, despite his promises to Plaintiffs that he would do so multiple times per week.

139.   Later, Mr. Metacarpa's Soldier On "Case Manager," Mr. Stenson, admitted to law enforcement that Mr. Metacarpa had made suicidal threats, including suicidal ideation on April 12, 2016, two days prior to Mr. Metacarpa's suicide.  Nothing was done by the Defendants to protect Mr. Metacarpa.

140.   After Mr. Metacarpa's death, Soldier On and the VA refused to answer many questions from Mr. Metacarpa's grieving mother and father, including: Who was in control of Mr. Metacarpa's medical care?; Who was monitoring Mr. Metacarpa's transfer and treatment among ACCF, Soldier On, and the various VA medical centers and their partnering entities?; and, why had Mr. Metacarpa been unaccounted for, denied admission, and not treated adequately leading up to the day of his death?

141.   On April 15, 2016, Plaintiff Christy Metacarpa, having been notified by law enforcement of her son's death, called and spoke with employees of Soldier On, including Mike McMahon and Defendant John F. Downing.  Defendant Mr. Downing was then the president and CEO of Soldier On.  No one from Soldier On or the VA bothered to notify the Metacarpas of their son's death.  Soldier On went through and permitted others to go through Mr. Metacarpa's personal effects and belongings without permission from his next of kin.

142.   During her second conversation with Defendant Mr. Downing, of Soldier On, at approximately 3:00 pm on April 15, 2016, Mr. Downing admitted that he did not know where Mr. Metacarpa's body was located.  Plaintiff Christy Metacarpa spoke with Mr. McMahon again on April 18, 2016.  On April 20, 2016, Christy Metacarpa received her son's belongings from Soldier On.  Inexplicably, many items were missing.

143.    On June 22, 2016, Defendant John F. Downing, of Soldier On, through one of his

agents, wrote to Plaintiffs Robert and Christy Metacarpa and lied to them about Mr. Metacarpa's

final days.  Soldier On falsely told Mr. Metacarpa's parents that Mr. Metacarpa arrived at Soldier

On on April 11, 2016 as opposed to April 8, 2016.  Soldier On further falsely claimed that Mr.

Metacarpa was simply referred to Soldier On by the Albany Court, despite the fact that Soldier

On initiated and requested Mr. Metacarpa's transfer based on promises of in-patient admission,

structured oversight, and mental health treatment.   Soldier On falsely claimed that Mr.

Metacarpa was scheduled for "a routine mental health assessment with our Staff Clinician, but he

took his life before attending that appointment."  Soldier On falsely claimed in its letter to

Plaintiffs Christy and Robert Metacarpa that it had "received no information" that Mr. Metacarpa

"might be a suicide risk."  However, Soldier On employees Mr. Stenson, Dr. Cahill, Mr. Crane,

Mr. Kocot and others were keenly aware of Mr. Metacarpa's history of suicidal ideation and

attempts, and his suicidal tendencies while residing at Soldier On.  Despite Mr. Metacarpa's

execution of valid HIPAA releases, it was later revealed that Soldier On never requested any of

Mr. Metacarpa's records from the VA.

144.    Upon information and belief, Soldier On receives government and private funding

based on the amount of residents it houses and recruits from confinement facilities, such as how

it procured Mr. Metacarpa from the ACCF.  However, Soldier On did not provide any

information to the Metacarpa family about its financial incentives to receive Mr. Metacarpa as a

patient.

145.    Subsequently in 2018, a VAMC-Leeds physician, Dr. Sarah Kemble, came

forward and filed a 23-page whistleblower affidavit, in which she revealed startling lapses in

care provided to psychiatric patients at VAMC-Leeds.  Dr. Kemble reported the VA's inadequate

psychiatric care just days before Dr. Kemble succumbed to cancer in 2018.  However, Dr.

Kemble had been the "Chief of Medicine" at the VAMC-Leeds facility, including during the

time that Mr. Metacarpa was living at VAMC-Leeds in April of 2016.

146.   Dr. Kemble reported the following inadequacies with respect to VAMC-Leeds :

a.   Substandard care at the VA, especially among psychiatric patients, resulting in
"patient harm";

b.   "Dangerous patient care, dangerous practices, and public safety issues";

c.   Poor leadership and delays in patient care;

d.   "Gross misuse of funds" and misappropriation of public funding that should have
been spent on psychiatric services;

e.   Lapses in lab services, radiology, clinical pharmacist and psychiatric services;

f.   Lack of essential staff to meet standards of care for urgent care facilities; and

g.   VA retaliation and reprisal against whistleblowers speaking up in support of
veteran-patients.

147.   Moreover, Dr. Kemble disclosed that, contrary to its own policies and the

standard of care established at VAMC-Leeds after Veteran Lucey's suicide there, the VA

discouraged psychiatrists from reviewing mental health cases in the wake of veteran suicides.

## CAUSES OF ACTION

### COUNT ONE
### NEGLIGENCE AGAINST DEFENDANTS SOLDIER ON,
### DR. KEVIN CAHILL, AND JOHN F. DOWNING

148.   The Plaintiffs incorporate by reference all other paragraphs and attachments to

this Complaint as though fully stated herein.

149.   At all times relevant to the Complaint, Mr. Metacarpa was under the medical care

and treatment of the employees, staff, nurses, case managers, and other related medical personnel

of the Defendants Soldier On and Dr. Kevin Cahill, which persons were all acting within the course and scope of their employment or agency with Soldier On.

150.    Based upon the facts stated herein, the employees, staff, nurses, case managers, and other related medical personnel of the Defendants Soldier On and Dr. Kevin Cahill failed to treat, observe, and otherwise provide medical care for Mr. Metacarpa in accordance with the accepted professional standards of care for similar health care providers within the same or a similar medical community, including the failure to adequately assess and treat Mr. Metacarpa after his arrival at Soldier On, failure to adequately communicate with Soldier On's partner and joint venturer in the VA, and failure to refer Mr. Metacarpa to the emergency room or to a physician upon learning of his suicidal thoughts, among the other acts and omissions described above.

151.    Soldier On, Dr. Cahill, and their employees, staff, nurses, case managers, and other related medical personnel undertook the duty to treat Mr. Metacarpa at least through April 15, 2016, and should have provided treatment in accordance with the accepted professional standards of care for like medical professionals.

152.    The standard of care as it applies to Dr. Cahill is that of a licensed mental health professional and officer of a behavioral health treatment facility holding itself out to the community as providing care for substance use and mental health disorders.  Soldier On and Dr. Cahill, and their employees, failed to meet this or any other applicable standard.

153.    As such, if Dr. Cahill assumed the care of Mr. Metacarpa personally or on behalf of Soldier On and its partner and joint venturer the VA, and he had the duty to perform or cause to be performed an independent assessment of the Mr. Metacarpa's psychiatric and substance use history and current condition including an assessment of suicide risk and measures to ensure

adequate management of any suicide risk. However, no assessment was conducted by Dr. Cahill.

154.    Mr. Metacarpa exhibited consistent signs of suicidal ideation from his PTSD and depression, which were ignored and progressed untreated by the Defendants until Mr. Metacarpa's death.

155.    Dr. Cahill and the staff at Soldier were negligent in, *inter alia*, (1) failing to assess Mr. Metacarpa's substance use disorder, (2) failing to assess his psychiatric condition and the impact on his substance use, (3) failing to assess his suicide risk, (4) failing to assign him to a safe level of monitoring and continued assessment, and failing to report and communicate with the VA regarding Mr. Metacarpa's continuity of care and safety.

156.    The Defendants' negligent treatment of Mr. Metacarpa and failures to adhere to the standard of care were a substantial contributing factor causing Mr. Metacarpa's injuries, emotional distress, and subsequent death.

### COUNT TWO
### NEGLIGENCE AGAINST DEFENDANT UNITED STATES OF AMERICA

157.    The Plaintiffs incorporate by reference all other paragraphs and attachments to this Complaint as though fully stated herein.

158.    The VA, as an agency of the United States of America, provided medical care to Mr. Metacarpa from 2004 until his death on the night of April 14-15, 2016.

159.    The VA was aware of Mr. Metacarpa's symptoms of PTSD and depression, including but not limited to previous suicide attempts, suicidal thoughts and statements, violent overreactions, nightmares, drug abuse, alcohol abuse, depression, flashbacks, and outbursts.

160.    Despite knowledge of these symptoms and Mr. Metacarpa's red flags and risks, as described above, the VA failed to provide adequate treatment and failed to recommend an

appropriate course of treatment for Mr. Metacarpa at VAMC-Leeds or in the days leading to his suicide.

161.    The VA negligently failed to implement a plan for Mr. Metacarpa's continuity of care, failed to monitor Mr. Metacarpa's transfer to Soldier On and desire and eligibility to enter VAMC-Leeds Ward 8 In-Patient Program, failed to pre-admit Mr. Metacarpa to an appropriate in-patient program such as Ward 8, failed to admit Mr. Metacarpa or hold him upon his initial screening at the VA on April 12, 2016 or upon his request for admission on April 14, 2016, and, failed to schedule an assessment or properly communicate and coordinate with, and/or supervise or follow up on Mr. Metacarpa and the care being provided by its partner and joint venturer, Soldier On.

162.    Mr. Metacarpa's treatment was far below the requisite standard of care.

163.    Mr. Metacarpa exhibited consistent signs of suicidal ideation from his PTSD and depression, which were ignored and progressed untreated by the Defendants until Mr. Metacarpa's death.

164.    The Defendants' negligent treatment of Mr. Metacarpa and failures to adhere to the standard of care were a substantial contributing factor causing Mr. Metacarpa's injuries, emotional distress, and subsequent death.

**COUNT THREE**
**WRONGFUL DEATH AGAINST DEFENDANTS SOLDIER ON,**
**DR. KEVIN CAHILL, AND JOHN F. DOWNING**

165.    The Plaintiffs incorporate by reference all other paragraphs and attachments to this Complaint as though fully stated herein.

166.    As a direct and proximate result of the Defendants' negligence, Mr. Metacarpa died on the night of April 14-15, 2016.

167.    The Plaintiffs bring this action for the wrongful death of Mr. Metacarpa for the benefit of his Estate and next of kin pursuant to M.G.L. c. 229 § 1, *et. seq.*

## COUNT FOUR
## WRONGFUL DEATH AGAINST DEFENDANT UNITED STATES OF AMERICA

168.    The Plaintiffs incorporate by reference all other paragraphs and attachments to this Complaint as though fully stated herein.

169.    As a direct and proximate result of the Defendant's negligence, Mr. Metacarpa died on the night of April 14-15, 2016.

170.    The Plaintiffs bring this action for the wrongful death of Mr. Metacarpa for the benefit of his Estate and next of kin pursuant to M.G.L. c. 229 § 1, *et. seq.*

## COUNT FIVE
## CONCIOUS PAIN AND SUFFERING AGAINST ALL DEFENDANTS

171.    The Plaintiffs incorporate by reference all other paragraphs and attachments to this Complaint as though fully stated herein.

172.    The Defendants' actions and omissions, as stated more fully herein, caused Mr. Metacarpa to endure substantial physical and emotional injuries and conscious pain and suffering prior to his death, for which his Estate is entitled to be compensated.

## COUNT SIX
## PUNITIVE DAMAGES AGAINST ALL DEFENDANTS

173.    The Plaintiffs incorporate by reference all other paragraphs and attachments to this Complaint as though fully stated herein.

174.    All of the aforementioned acts and omissions of the Defendants constitute gross negligence, and/or rose to the level of malicious, willful, wanton, and reckless conduct, negligence and gross negligence within the meaning of the Wrongful Death Statute, M.G. L. c. 229, § 1, *et seq.*, so as to merit an award of punitive damages.

175.    The Plaintiffs seek punitive damages caused by to the Defendants' malicious, willful, wanton, and reckless conduct, negligence and gross negligence resulting in the death of Mr. Metacarpa.

**COUNT SEVEN**
**LOSS OF CONSORTIUM AND SOCIETY AGAINST ALL DEFENDANTS**

176.    The Plaintiffs incorporate by reference all other paragraphs and attachments to this Complaint as though fully stated herein.

177.    Plaintiffs Christy and Robert Metacarpa relied on Garrett B. Metacarpa for support, services, love, companionship, and planned to rely on him in future years to assist them as senior citizens.

178.    Plaintiffs Christy and Robert Metacarpa have suffered considerable mental and emotional pain and suffering as a result of the loss of their son.

179.    As the decedent's parents, Plaintiffs Christy and Robert Metacarpa are entitled to recover on claims for loss of consortium and society suffered prior to and following Mr. Metacarpa's death.

180.    As a direct and proximate result of the negligence of the Defendants as alleged herein, Plaintiffs Christy and Robert Metacarpa, individually and as Administrators to the Estate of Garrett B. Metacarpa, make the following claims for damages on behalf of themselves as the decedent's parents, and on behalf of the decedent's family members:

    a.   Mental pain and suffering of the decedent's parents and family members as a result of the injury and death of Garrett B. Metacarpa; and

    b.   Loss of support and services, companionship, loss of consortium and society as a result of the injuries suffered prior to and after the death of their son, Garrett B. Metacarpa.

## COUNT EIGHT
## INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## AGAINST ALL DEFENDANTS

181.   The Plaintiffs incorporate by reference all other paragraphs and attachments to this Complaint as though fully stated herein.

182.   The Defendants' intentional and negligent actions and omissions, including Mr. Downing's false statements and the other facts stated more fully herein, caused Mr. Metacarpa and the Plaintiffs to endure and suffer substantial emotional distress and injuries, before, during and after Mr. Metacarpa's death, which were compounded by efforts by Defendants Soldier On and Mr. Downing to mislead and lie to the Plaintiffs after Mr. Metacarpa's death.

## PRAYER FOR RELIEF

183.   WHEREFORE, the Plaintiffs pray that the Court enter judgment in Plaintiffs' favor against Defendants on all counts and provide the following relief:

a.   monetary damages in an amount to be proved at trial;

b.   the fair monetary value of the decedent to the persons entitled to receive the damages recovered, for the loss of the reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of the decedent to the persons entitled to the damages recovered;

c.   the reasonable funeral and burial expenses of the decedent;

d.   punitive damages in an amount of not less than five thousand dollars in such case as the decedent's death was caused by the malicious, willful, wanton or reckless conduct of the Defendants or by the gross negligence of the Defendants;

e.   damages for conscious pain and suffering, injuries and other harms;

f.   attorneys' fees, expenses, expert costs, costs, and interest; and

g.  Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

184.    The Plaintiffs, by and through their attorneys, Egan, Flanagan & Cohen, P.C.,

demand a trial by jury on all issues so triable.

FOR THE PLAINTIFFS,
CHRISTY METACARPA,
ROBERT METACARPA, AND
ESTATE OF GARRETT B. METACARPA,
BY THEIR ATTORNEYS,

*/s/ Michael G. McDonough*

Michael G. McDonough, Esq. BBO#682128
Lauren F. Olanoff, Esq. BBO # 669371
Kevin D. Withers, Esq. BBO # 531660
Egan, Flanagan & Cohen, P.C.
67 Market Street – P.O. Box 9035
Springfield, MA 01102-9035
Tel: (413) 737-0260; Fax: (413) 737-0121
mgm@efclaw.com; lfo@efclaw.com;
kdw@efclaw.com

April 2, 2019

16665-160714\363195